## Bell Appeal.

Argued June 10, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

Before GUFFEY, J.

*T. Robert Brennan* and *Louis C. Glasso,* with them *Brennan and Brennan,* for appellants.

*J. Frank McKenna, Jr.,* City Solicitor, with him *Charles N. Caputo,* Assistant City Solicitor, for appellee.

OPINION BY HIRT, J., September 11, 1958:

Joseph Bell, George E. Tarr and William Killeen, in various capacities, were members of the police department of the City of Pittsburgh, assigned to service out of police station number one in Pittsburgh. They were tried by a police trial court (in accordance with §7 of the Act of August 10, 1951, P. L. 1189, 53 PS §23537) in substance, on charges of neglect of duty and of unbecoming official conduct. This so-called "Court of Trial or Inquiry" found that the charges were sustained and its decision, affirmed by the Mayor of Pittsburgh, authorized the Director of Public Safety to dismiss all of them from the service. Thereupon in accordance with §8 of the Act, the three appealed to the Civil Service Commission of the City of Pittsburgh, and when the decision of dismissal was affirmed by the

commission, further appeals were taken to the lower court. After hearing the charges *de novo,* the court sustained the decisions of the commission thus affirming the action of the police trial court dismissing the police officers from the service. Since all of the charges arose from interrelated facts we will dispose of the three present appeals in this one opinion.

William Killeen was a foot patrolman on a beat covering about ten city blocks in downtown Pittsburgh. About 2 a.m. on July 3, 1957, a civilian, who later was booked as Joseph Moro, accosted this officer near the Market House on Diamond Street. Killeen testified that the man had been drinking and that he was belligerent and obscene in his language, when he complained to Killeen that his automobile had been stolen. Killeen arrested him for disorderly conduct and, in taking him to the call box about a block away, to summon the wagon, struck him with his night stick. The prisoner was wounded in the forehead either as a result of the blow or from falling against the brick wall of the Market House. As the patrol wagon pulled up, appellant Joseph Bell appeared on the scene. He was the acting lieutenant assigned to supervision of all the policemen patrolling the beat covered by Killeen. Tarr was standing nearby but took no part in the arrest. Bell helped the prisoner into the wagon. Police officer Thomas Foley was the driver of the patrol wagon and E. J. Mocieka was an officer who was detailed to service with him. Killeen remained on his beat, but Bell with the two wagonmen went to Allegheny General Hospital with the prisoner and they remained with him until after his wound was dressed and until he was delivered to the turnkey at number one police station. Killeen had not inquired as to the identity of the man whom he had arrested. He testified in effect that when an injured prisoner needs treat-

ment at a hospital it is the usual practice for the wagonmen, and the police officers who subsequently have him in charge, to ascertain who he is. At the hospital the prisoner gave his name as Joseph Moro and at the police station the desk sergeant prepared a Police Special Report on which the name Joseph Moro, taken from the "Aided Case Report of the Hospital", appeared. Bell signed the report along with the desk sergeant and the prisoner was booked as Joseph Moro. He was released however when he posted $10 cash bail for his appearance at a hearing. This was forfeited later when he failed to appear at the appointed time.

As early as July 9, 1957, within six days after the arrest, it was known for a certainty that the Joseph Moro, who had been taken into custody by Killeen, in reality was Tony Grosso, allegedly a notorious gambler.

The specific charges against each of the appellants may be summarized thus: It was charged that Killeen either knew Tony Grosso, a notorious person, or should have known him, and that he failed to disclose Grosso's identity at the time of the arrest, or later. The same charge was made against Tarr, who knew Grosso and was present near the place of arrest. Bell also was charged with failure to disclose the identity of Grosso although he allegedly knew him when he signed the Special Police Report which named the prisoner as Joseph Moro.

In the appeal of Bell the lower court found: "As Acting Lieutenant, Bell was charged with the responsibility of making sure that the accused was booked under his proper name. Grosso was, however, charged at the scene of the arrest and later on at the police station under an assumed name. Acting Lieutenant Bell well knew this and yet participated in concealing the accused's identity." The lower court in its adjudication of Killeen found that "he was instrumental with

other officers in concealing the identity of Tony Grosso when the latter was charged with disorderly conduct." And the adjudication in referring to the finding in that appeal contains this comment, in italics: "The Court is of the opinion that the bare withholding of the identity of an arrested person of notoriety is most certainly conduct unbecoming of an officer and just cause for dismissal in the instant appeals."

Construction of the Act of May 23, 1907, P. L. 206 (a predecessor of the present Act) was involved in *Thomas v. Connell et al.,* 264 Pa. 242, 107 A. 691. In the opinion in that case the Supreme Court said: "What constitutes ample cause for removal within the limits fixed by the act must necessarily be largely a matter of discretion on the part of the head of the department. To be sufficient, however, the cause should be personal to the employee and such as to render him unfit for the position he occupies, thus making his dismissal justifiable and for the good of the service." This holding was quoted with approval in *Caldwell v. Fairley et al.,* 363 Pa. 213, 69 A. 2d 135. In *Ditko Appeal,* 5 D. & C. 2d 569, affirmed in 385 Pa. 435, 123 A. 2d 718 on the opinion of the court below, the question involved was the propriety of the discharge of a policeman by a third class city council under a similar Act, for conduct unbecoming an officer. It was there held: "No [police] officer should be dismissed from service unless it is for *just* cause, not only charged but proven by substantial evidence. His position cannot be jeopardized by mere suspicious circumstances." In *Vega Appeal,* 383 Pa. 44, 117 A. 2d 736, the question had to do with the propriety of the dismissal of a police officer by a borough under the Act of June 15, 1951, P. L. 586. It was there held that by the statute the common pleas had the power to determine the case "as the court

deems proper" but the appeal to the Supreme Court was by certiorari in the broadest sense, since the statute involved was silent as to the right of appeal. For the same reason the appeal to us in the instant case is on broad certiorari. The evidence therefore is before us, and under it, in our view, the lower court clearly abused its discretion in affirming the orders of the commission in these cases since its findings were not supported by substantial competent evidence. Cf. *Gartland v. City of Philadelphia et al.,* 70 D. & C. 161, 164 and *Philadelphia Civil Service Commission v. Connolly,* 1 D. & C. 2d 399, 424, 425.

We may take it as established that the name Tony Grosso was well known to be that of a notorious gambler and racketeer. But certainly the known bad reputation attached to a name does not impute knowledge of the identity of the person who bears the name. It is an interesting fact in these cases that while Grosso was referred to as notoriously bad, yet he had been arrested for crime in the City of Pittsburgh only once—and that almost 10 years earlier, in 1938, when he was picked up on a lottery charge upon which when convicted he paid a fine of $25 in satisfaction of the whole penalty imposed. The fact that Grosso had not been arrested and brought to book, by the efficient police department of the City of Pittsburgh (but cf. *Commonwealth v. Grosso,* 169 Pa. Superior Ct. 606, 611, 84 A. 2d 239) on other occasions is rather impressive evidence that his identity was not known to the police in the area; and this perhaps because his illegal operations were confined to the County of Allegheny outside the city. Killeen testified that he didn't know Tony Grosso at the time of the arrest to identify him. The suggestion is made that Killeen was covering up because he was "consorting" with Grosso on this occasion. Again the

circumstances rebut the inference. Consort between persons implies accord, agreement, harmony and mental processes of individuals who have something in common. That Killeen hit Grosso with his night stick and inflicted a head injury that called for first aid at a hospital certainly is not among the conventional facts from which consort between individuals may be inferred.

Killeen had been a police officer of the City of Pittsburgh since January 19, 1940. His good character and unblemished record were admitted by all of the police officers who testified in the lower court. There is evidence that his reputation for veracity also was good. It is rather significant that none of the five police officers of experience comparable with that of Killeen, who testified in the court below, knew Tony Grosso to identify him. These witnesses included: Acting Sergeant Hagan who prepared The Police Special Report and saw the prisoner in the well lighted police station; officers Foley and Moceika in charge of the prisoner on the wagon, both of whom had been on the police force for a number of years; Police Sergeant Caplan who had been on the force eighteen years; and officer James E. O'Connor who had been a criminal court investigator since 1938.

The dismissal of Bell rests on the finding that he: "As Acting Lieutenant . . . was charged with the responsibility of making sure that the accused was booked under his proper name" in the performance of his duty of supervising the acts of the officers under his command; that he knew that the prisoner had been arrested and charged under an assumed name and that he "participated in concealing the accused's identity."

The testimony as to Tarr (denied by him) is that he was standing 25 feet from the curb in Diamond

Street at the time of the arrest. He alone of the three knew Grosso to identify him. There is no evidence however that he had or should have had any part in the arrest. He was not on duty at the time and place of the arrest and he therefore had no duty to see to it that Grosso's proper name appeared on the police record. Tarr had been in the police service for more than 15 years and his record was unquestioned. Bell arrived at the scene after the arrest. He did not know Grosso on sight and did not learn his identity until some time later. There is no evidence which even remotely tends to indicate that Killeen knew Grosso. And certainly no inference is possible from the evidence that the three officers conspired to suppress the identity of Grosso.

We need not speculate as to why the present proceedings were initiated against the three officers. The arrest was on a routine disorderly conduct charge. The forfeiture of Grosso's cash bail in the sum of $10 when he failed to appear, apparently satisfied the City's case against him. He was never brought in to answer the charge. He was identified one week after his arrest, when the police record presumably was amended to show his true name. The ends of justice were not prejudiced in any degree in the meantime. These three officers have exemplary police records throughout their respective terms of service ranging from 16 to 28 years. A police officer should be protected and his position preserved against unfounded attack; that is the purpose of Civil Service. *Ditko Appeal,* supra. Charges of conduct unbecoming an officer were not established in these cases by substantial evidence under the test of *Thomas v. Connell et al.,* supra, and the lower court clearly abused its discretion in affirming the orders of the Civil Service Commission in these cases.

The order in each of the three appeals before us is reversed with the same effect as though the charges had been dismissed in the lower court.

RHODES, P. J., would affirm the court below in sustaining the dismissals of George E. Tarr and William Killeen from the service as police officers.